IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NEWELL-RUBBERMAID, INC.,<br><br>Plaintiff,<br><br>-v.-<br><br>THE RAYMOND CORPORATION, et al.,<br><br>Defendants. | Case No. 5:08-cv-02632-SL<br><br>Judge Sara Lioi<br><br>**THE RAYMOND CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF BEN RAILSBACK** |

Defendant, The Raymond Corporation ("Raymond"), hereby submits its Brief in Support of its Motion to Exclude the Testimony of Plaintiff's Expert, Ben Railsback.

## BACKGROUND

This is a subrogation action in which Plaintiff, Newell Rubbermaid, Inc. ("Newell Rubbermaid") seeks to hold Defendant, The Raymond Corporation, responsible for workers compensation benefits that Newell Rubbermaid paid to its former employee Jean Hashman for injuries she sustained as a result of a forklift accident on December 23, 2004. (Complaint, ¶¶7-15). Ms. Hashman was injured while operating a Dockstocker Model DSS300TT forklift ("the Dockstocker") during the course of her employment at the Newell Rubbermaid warehouse in Canton, Ohio. (*Id.*)

The subject Dockstocker is a stand-up, counterbalanced, rear entry forklift designed for use "dock to stock," including loading and unloading docked tractor-trailers and storing heavy loads in narrow aisle warehouse environments. Newell Rubbermaid has a fleet of more than 200 forklifts, including multiple Dockstocker and Raymond lift trucks. (Ex. A, Depo. of Jeremy Zahn, 92:8-14; 122:4-19). However, Newell Rubbermaid did not purchase the subject Dockstocker from Raymond, but rather purchased it secondhand from a dealer of used equipment. (Ex. B, Depo. of Edwin R. Mauser, 23:9-21; Ex. C, Truck Purchase Invoice, previously marked as Exhibit 2 to Mauser Depo.).

QB\9851994.1

Raymond designed and manufactured the Dockstocker in conformity with ANSI/ASME B56.1-1993, the design standard for forklifts. (Ex. D, Depo. of Robert Kerila, 77:23-78:23; Ex. E, pertinent excerpts of ANSI/ASME B56.1-1993). The B56.1 standard has been adopted by reference by OSHA, and mandates that the operator compartment for stand-up lift trucks like the Dockstocker be designed to permit easy and rapid egress from the operator compartment. (Kerila Depo., 78:12-23; 29 C.F.R. §§ 1910.178(a)(2), 1910.6). For that reason, the Dockstocker (and every other stand-up forklift, for that matter) is designed in its standard configuration with an open back compartment. Below is a photograph of the Dockstocker, shown from the rear, looking in to the operator compartment. (Ex. F, marked as Exhibit 5 to Depo. of Jean Hashman).



The Dockstocker has a warning decal placed on the overhead guard support, directly facing the operator. (Ex. G, previously marked as Exhibit 2 to Hashman Depo.). The first five warnings on the decal state as follows:

QB\9851994.1 2



In some warehouse environments, there is a heightened hazard that long items, such as lumber or pipes, may intrude into the operator compartment. To help guard against this hazard, Raymond has for many years offered an optional rear operator guard for the Dockstocker. (Kerila Depo., pp. 38-40, 79; Ex. H, Raymond Features Brochure at Raymond 00946). The optional rear guard is a hinged, spring-loaded, non-latching guard. Its purpose is to prevent objects from intruding into the operator compartment, and it is neither intended to nor capable of preventing an operator from exiting the operator compartment. Moreover, a rear operator guard is not standard equipment on the Dockstocker (or any other stand-up lift truck), because it has significant downsides, including but not limited to: (1) slowing an operator's escape from the truck in the event of an emergency; (2) the risk of traumatic amputation if the operator has partially exited the operator compartment when a rear collision occurs; (3) increased heat build-up in the operator compartment; and (4) increased operator fatigue and discomfort. (Raymond Features Brochure, at Raymond 00946; Kerila Depo., pp. 46-53). Neither the original owner nor

Newell Rubbermaid opted to purchase the rear operator guard for the subject Dockstocker, although Newell Rubbermaid has stipulated that it was aware of the guard's availability.

Ms. Hashman began operating Dockstockers only two months before her accident, and was ill at ease on the truck at the time of her accident. (Ex. I, Hashman Depo., 50:11-51:4). She testified that she was "uncomfortable" because she did not think that she had received sufficient training from Newell Rubbermaid on how to operate the truck. (*Id.*, 53:24-54:5). Indeed, she does not recall ever having read the warning decal on the Dockstocker or the operator manual, and no one from Newell Rubbermaid explained the manual to her. (*Id.*, 14:8-12; 15:8-16:25). However, she did know that she had to keep all limbs inside the operator compartment while operating the truck, or she could get hurt. (Ex. J, 5/23/2007 Depo. of Jean Hashman, p. 47).

At the time of her accident, Ms. Hashman was traveling at less than one-third of the full speed of the truck in a tractor first (or "forks trailing") direction with no load, standing in the operator compartment, facing in the direction of the forks, with her right foot on the deadman pedal,[1] and her hands on the controls. (Ex. I, Hashman Depo., 26:9-27:13; 24:9-19). She testified that she intended to drive towards the "robot cage," stop, and then turn around to pick up a load, when she was unable to stop the lift truck. (*Id.* at 19:3-10). She "got scared," and intentionally "stepped off" of the lift truck. (*Id.* at 19:12-17, 20:11-14; Ex. K, Aff. of Jean Hashman dated 11/22/2006, ¶5; Ex. J, 5/23/2007 Hashman Depo., p. 52). Her foot was then run over by the lift truck and she became trapped between the truck and the robot cage, sustaining serious injuries. (*Id.*). Hashman has consistently maintained that she did not lose her balance, but rather intentionally exited the moving forklift. (*Id.* at pp. 52-53; Ex. I, Hashman Depo. at

---

[1] The deadman pedal is located on the floor of the operator compartment, and must be depressed in order to provide power, release the brake, and operate a forklift. The deadman pedal is intended, in part, to prevent operation of the forklift without an operator at the controls in the operator compartment.

20:2-14). She agrees that if she had stayed in the operator compartment instead of leaving it, she probably would not have been injured. (Ex. J, Hashman Depo. dated May 23, 2007, p. 56).

The post-accident inspection of the brakes found no malfunction or other problem with the subject Dockstocker's brakes. (Ex. L, Depo. of T. Patrick McGath pp. 37-42). In fact, Newell Rubbermaid's investigation found no fault at all with the Dockstocker truck. In its investigative report, Newell Rubbermaid cited poor judgment, training, congestion, and noise exposure as causes of Ms. Hashman's accident. (Ex. M, Newell Rubbermaid's Supervisor Incident Investigation Report, previously marked as Exhibit 1 to Depo. of Todd Livengood). Notably, while the report form provides a laundry list of potential causes to choose from, the following were not circled as causes of the accident: "using defective equipment," "defective tools, equipment, substances," and "purchase of inadequate/inferior equipment." (*Id.*).

Ms. Hashman sued Newell Rubbermaid, alleging a workers compensation claim, a VSSR claim, and intentional tort claims. (Ex. N, Hashman Complaint against Newell Rubbermaid, previously marked as Exhibit 5 to Zahn Depo.; Ex. O, Hashman VSSR claim against Newell Rubbermaid). Ms. Hashman did not file a claim against Raymond.

After settling Ms. Hashman's claims, Newell Rubbermaid commenced a first lawsuit against Raymond on December 21, 2006, claiming that the Dockstocker was defectively designed because it was not equipped with a device that would prevent an operator from placing his or her limbs outside the confines of the within the operator compartment. (Ex. P, Original Complaint, ¶14). However, Newell Rubbermaid voluntarily dismissed the first action.

Newell Rubbermaid began fabricating and installing rear operator guards on its fleet of stand-up forklifts in 2008, and made a decision in 2009 to implement the change throughout its

fleet. (Zahn Depo., 57:13 - 58:10, 59:9 - 61:16, 62:8-17). Notably, Newell Rubbermaid decided not to purchase rear operator guards from Raymond, in part to save money. (*Id*. at 85:18-20).

Newell Rubbermaid refiled its Complaint in this Court on November 6, 2008, alleging design defect and warning claims against Raymond based on the Ohio Product Liability Act, common law negligence, and breaches of the implied warranties of merchantability and fitness for a particular purpose.[2] The gravamen of Newell Rubbermaid's claims, extolled by its expert, Ben Railsback, is that the Dockstocker is defective because it does not have a latching rear door to prevent operators from placing their limbs outside the operator compartment.

## ARGUMENT
## THIS COURT SHOULD EXCLUDE THE PROFFERED TESTIMONY OF NEWELL RUBBERMAID'S EXPERT, BEN RAILSBACK

Mr. Railsback is the quintessential expert for hire, and his opinions in this case are pure litigation constructs. He has never designed a latching rear door for a stand-up forklift like the Dockstocker. He has never designed a non-latching door for a stand-up forklift. He has never designed the operator compartment for a forklift. He has never consulted with a forklift manufacturer on the design of a stand-up forklift or forklift component. He has never been formally trained to operate a stand-up forklift. He has never operated either a Dockstocker or Raymond stand-up forklift. He has never designed or drafted a warning or operator's manual for a forklift. He has never written to or otherwise communicated with the B56.1 committee that drafts the design standards for stand-up forklifts. (Depo. of Ben T. Railsback, 310:4-312:16). With some difficulty, Mr. Railsback admitted that "[y]our knowledge of forklifts, your work in connection with forklifts, and specifically stand-up forklifts, all of that was done in connection litigation of one type or another." (*Id*., 309:16-310:3).

---

[2] Newell Rubbermaid recently agreed to stipulate to the dismissal of its claims against Andersen and Associates, Inc., and the parties should have the stipulation filed within the next few days

A. **The Legal Standard For Evaluating Admissibility Of Expert Testimony.**

Under Rule 702 of the Federal Rules of Evidence, the testimony of a proposed expert witness is admissible only where the trial court determines that a witness is "qualified as an expert by knowledge, skill, experience, training, or education," and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In performing their "gatekeeping" role under Rule 702, trial courts assume responsibility for ensuring that proposed expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786 (1993)).

In *Daubert*, the Court described the threshold test of admissibility as "a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to *the facts at issue*." *Daubert*, 509 U.S. at 592-93 (emphasis supplied). In reviewing methodology, the Court should look at whether "the testimony is the product of reliable principles and methods" and whether the expert "has applied the principles and methods reliably to *the facts of the case*." Fed. R. Evid. 702 (emphasis supplied).

In determining reliability, this Court may consider the following non-exhaustive factors set forth in *Daubert*:

(1) whether the theory in question can be and has been empirically tested;
(2) whether the theory in question has been subjected to peer review and publication;
(3) the theory's known or potential error rate and whether that rate is acceptable; and
(4) whether the theory is generally accepted in the scientific community.

*Daubert*, 509 U.S. at 593.

In addition to the four factors identified in *Daubert*, the Sixth Circuit has recognized a fifth factor, namely whether the theory was prepared solely for litigation. *See Johnson v.*

*Manitowoc Boom*, 484 F.3d 426, 434 (6th Cir. 2007). Raymond submits that the first, fourth, and fifth factors are relevant to considering the admissibility of Mr. Railsback's testimony.

### B. Mr. Railsback Is Not Qualified To Give Expert Testimony Regarding The Design Of The Subject Dockstocker Forklift

Mr. Railsback is precisely the kind of hired gun that *Daubert* and its progeny are intended to stop at the gate. *See Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (excluding expert as a "classic hired gun" with no particular expertise concerning the allegedly defective product). Everything Mr. Railsback has to say about forklifts arises from the exigencies of litigation, namely the need to identify a design defect. As noted above, Mr. Railsback lacks any practical, non-litigation experience with forklifts, and all of his knowledge and opinions regarding forklift design arise from the needs of his testimony in litigation. Moreover, the bare fact that Mr. Railsback holds an engineering degree does not qualify him to give expert testimony regarding forklifts.

An engineer does not qualify as an expert simply because he is an engineer or claims expertise in a given field. *See e.g. Pride v. Bic Corporation*, 218 F.3d 566, 577 (6th Cir. 2000). "The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (citing *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). As one court noted in excluding an engineering expert in a case involving steel belted radial tires:

> Experience in the technology of fruit is not sufficient when analyzing the science of apples. Courts have excluded the testimony of engineers because their expertise was not particular to the science involved in the case. Mr. Forney's expertise and experience do not "fit" the facts of this case.

QB\9851994.1

8

*Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1357 (D. Ariz. 1996). In short, the only basis on which Mr. Railsback can claim to be an expert in forklift design is that he has "played one" in the courtroom, and that is insufficient to get past the gate.

### C. Mr. Railsback's Latching Rear Door Opinion Is Unreliable As It Fails Each Of The Relevant Daubert Factors.

Cutting through the sheer bulk of Mr. Railsback's report, his opinion boils down to a simple, albeit erroneous assertion: that the subject Dockstocker (and every other stand-up forklift, for that matter) is defectively designed because it does not incorporate a latching rear door as standard equipment. Trouble is, Mr. Railsback's opinion is unadorned *ipse dixit*, and the utter lack of scientific rigor undergirding his opinion renders his testimony unreliable.

The key problem for Mr. Railsback's latching rear door theory is that while it may prevent some lower leg injuries to operators of stand-up forklifts, it does so at the cost of killing or paralyzing forklift operators in other accidents. As several authorities have noted, a latching rear door would slow down or prevent an operator from exiting the operator compartment in an emergency, such as an off-the-dock or tip-over event, thereby causing the operator to fall with the forklift and creating a high probability of quadriplegia or death. (Ex. Q, Packer Engineering Report of Michael Rogers, pp.8-9. (discussing Packer Engineering off-the-dock tests)); *see also, e.g.*, *Ortiz v. Yale Materials Handling Corp.*, 2005 WL 2044923 at *9 (D.N.J. 2005) (citing Crockett & Miller Report (1995) report with approval for proposition that "any device, such as a latching door, which slows or prevents an operator's egress in an emergency situation, such as a tip-over or off-dock accident, creates an unacceptable risk of severe injury or death"); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 744-46 (N.D. Ill. 2005) (denying plaintiff's *Daubert* challenge to Packer Engineering's off-the-dock tests, and holding tests were relevant to proposed

latching rear door, because "[o]ff-the-dock accidents . . . should factor into any consideration of the net benefit of a new design [*i.e.*, the proposed latching rear door]").

### 1. Mr. Railsback Has Chosen Not To Design, Let Alone Test, His Proposed Latching Rear Door.

At the core of Mr. Railsback's latching rear door theory is an assumption that an operator is better off (or at least no worse off) staying in the operator compartment of a stand-up truck and "riding out" off-the-dock and tip-over events, instead of exiting the operator compartment at the outset of such events. The trouble with Mr. Railsback's assumption is that it directly conflicts with numerous studies (including those performed by Packer Engineering) showing that "riding out" an off-the-dock or tip-over event exposes the operator to likely severe injury and/or death.

As a result, one would expect to see some effort on Mr. Railsback's part to develop and test his proposed latching rear door to establish that it does not diminish the utility of stand-up lift truck equipped with the door, or expose operators to catastrophic and/or fatal injury in tip-overs and off-the-dock accidents. This would not be an expensive or complex undertaking, as it would entail fabricating the proposed latching rear door, obtaining a stand-up truck on which to mount it, and designing and running test to determine the latching rear door's effect on truck utility and the likelihood and severity of injuries with and without the latching rear door in off-the-dock and tip-over events. As noted above, Mr. Railsback has not even designed, let alone tested, an embodiment of his latching rear door theory. As such, it is difficult to discern how he can reliably assert that his latching rear would lower the overall hazard associated with the truck. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (noting that many alternative design considerations "are product and manufacturer-specific and cannot be reliably determined without testing.").

### 2. Mr. Railsback's Latching Rear Door Theory Is Not Accepted By Any Relevant Community

Mr. Railsback's proposed latching rear door has not been accepted by the courts, ANSI, OSHA, the forklift industry, and perhaps most tellingly, his own client.

Not Accepted By The Courts. The latching rear door alternative design theory advanced by Mr. Railsback has repeatedly failed *Daubert* scrutiny. *See, e.g., Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001), *Anderson v. Raymond Corp.*, 340 F.3d 520, 524-25 (8th Cir. 2003), *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730 (N.D. Ill. 2005), *Ortiz v. Yale Materials Handling Corp.*, 2005 WL 2044923 (D.N.J. 2005), *Berry v. Crown Equipment Corp.*, 108 F. Supp. 2d 743 (E.D. Mich. 2000).

Not Accepted By ANSI Or OSHA. On two separate occasions, it has been proposed to the ANSI/ASME B56.1 committee that a latching rear door be required on every stand-up forklift, precisely the argument by Mr. Railsback in this case. The proposal was overwhelmingly rejected both times. *Ortiz*, 2005 WL 2044923, *9, n. 8 ("In the last 15 years, ANSI has twice rejected [John] Sevart's proposed rear door design. Each time there was a vote with respect to the proposal, Sevart's design only received a vote of 1 or 2 — one vote coming from Mr. Berry, a chief engineer with Sevart's company, who was instructed to vote in Sevart's favor."); *see also Dhillon*, 269 F. 3d at 870-71 ("Sevart has twice tried to persuade the professionals on the American National Standards Institute Committee to require a rear door; the committee has twice rejected the idea."); *Phillips*, 364 F. Supp. 2d at 737 (rejecting "conspiracy theory" that ANSI was "resisting mandatory improvements for forklifts").

Moreover, ANSI has not merely declined to mandate latching rear doors on stand-up forklifts. To the contrary, the latest ANSI B56.1 standard moves even further away from acceptance of latching rear door on stand-up forklifts: "Operator protection means shall be

designed so as not to interfere with the normal operation of the controls, to allow getting on and off the truck easily, and *to permit rapid exit in an emergency*." (Ex. R, ANSI/ASME B56.1 § 7.30.3 (2005) (emphasis supplied)). That is not all. OSHA has adopted the B56.1 standard by reference, and mandates that employers acquire and use only forklifts that comply with the B56.1 standard. *See* 29 C.F.R. §§ 1910.178(a)(2), 1910.6.

Not Accepted By The Industry. The absence of latching rear doors in the stand-up forklift market has repeatedly been cited by courts as a basis for excluding the testimony of experts advocating such a door on every stand-up forklift. *See Dhillon*, 269 F.3d at 869 (excluding plaintiff's experts, noting that plaintiff could not identify "even one forklift manufacturer that has installed rear doors for general application or even one regulatory body or standards organization that requires or recommends a rear door on forklift stand-up trucks"); *Phillips*, 364 F. Supp. 2d at 737 (same); *Ortiz*, 2005 WL 2044923 at *9 ("In addition to the fact that the entire lift truck industry adheres to the opposite view of Sevart, Sevart's rear door theory has been rejected twice by ANSI. In fact, no forklift manufacturer offers a stand-up forklift with a rear door as standard equipment.") The rationale applies with equal force here.

Not Accepted By His Own Client, Newell Rubbermaid. Jeremy Zahn, Newell Rubbermaid's Corporate Director of Safety and Health, testified at deposition as Newell Rubbermaid's Rule 30(b)(6) representative. In other words, his testimony is binding on the company. He testified that the rear operator guards that his company designed and installed on its fleet of stand-up forklifts were not equipped with locks or latches. When asked why that was the case, Mr. Zahn stated that it was a conscious decision based upon the need to provide the operator the ability to exit the truck in the event of an emergency off-the-dock or tip-over event.

QB\9851994.1                                         12

(Zahn Depo., 74:5-75:4).  As Mr. Railsback acknowledges, Newell Rubbermaid's rejection of latching rear doors is directly at odds with his own opinions.  (Railsback Depo., 130:6-16).

        3.      **Mr. Railsback's Opinion Was Created Solely For The Purpose Of Litigation.**

This case has strong echoes of the Sixth Circuit's decision in *Johnson v. Manitowoc Boom*, 484 F.3d 426 (6th Cir. 2007), which held that the district court was well within its discretion to engage in a more rigorous *Daubert* analysis (and exclusion) of expert testimony that was created solely for the purpose of litigation.  In *Johnson*, plaintiff's expert opined that a large truck mounted crane should have been equipped with an interlock to detect if its outriggers were properly contacting the ground and supporting the crane.  In considering a *Daubert* challenge to plaintiff's expert, the Court focused primarily on two factors: (1) the expert's failure to test the proposed interlock, and (2) the expert's opinions were created solely for the purpose of litigation.

The *Johnson* court observed that "[t]his Court has recognized for some time that expert testimony prepared solely for the purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution."  *Id*. at 434.  In affirming the district court's exclusion of plaintiff's expert, the *Johnson* court cited with approval the following passage from the district court's decision:

> Consideration of the context of an expert's opinion is especially important given the potential for abuse in light of the incredible benefits of hindsight.  <u>Here, the expert's opinions were conceived, executed, and invented solely in the context of this litigation.  The expert here does not even offer a proposed design that would necessarily make this crane safer; he merely offers a mechanism that might have prevented a very specific accident that occurred under very specific conditions.</u>

*Id*. at 435 (emphasis supplied).

The holding in *Johnson* applies with equal vigor in this case.  As noted above, litigation is Mr. Railsback's only connection to stand-up forklifts.  To this day, he has never operated either a Raymond or Dockstocker stand-up forklift.  Moreover, he has not designed a latching or

non-latching rear door for a stand-up forklift, but, like the expert in *Johnson*, merely offers a mechanism (i.e., a latching rear door) that "might have prevented a very specific accident that occurred under very specific conditions."

    4.    **Mr. Railsback Erroneously Relies Upon And Extrapolates From Crown Accident Data.**

Crown Equipment is a Raymond competitor in the forklift industry, and Mr. Railsback has been retained in the past to provide expert testimony against Crown, including analysis of accidents involving Crown forklifts. In this case, Mr. Railsback is relying on his analysis of Crown accident reports in order to reach conclusions regarding accidents involving Dockstocker and Raymond forklifts. (Ex. V, Report of Ben T. Railsback, B.6., B.9. - B.16.). However, Mr. Railsback's reliance on Crown accident reports is troubling for several reasons.

First, as Mr. Railsback admits, he is of the opinion that control system deficiencies and defects in Crown trucks have been a cause of accident involving Crown trucks, yet he holds no such opinion with respect to Raymond trucks. (Railsback Depo., 91:20-93:10). Given this admitted distinction between Crown and Raymond/Dockstocker stand-up lift trucks, it is difficult to discern a scientific or other rationale basis on which Mr. Railsback could conclude that Crown accident rates are fungible with or transferable to Raymond/Dockstocker.

Second, as Mr. Rogers notes in his report, there are substantial differences in the design of Crown and Raymond stand-up forklifts. (Ex. Q, Rogers Report, p. 11). For example, the manufacturers have different size deadman pedals in different locations in the operator compartment, which affects the positioning and movement of operators' feet. (*Id.*).

Third, whether considered from a legal or scientific perspective, the evidentiary defects in the Crown and Raymond accident reports are manifest and legion. For example, with respect to Raymond accident reports, none of the reports was prepared by Raymond, none has been

authenticated, and all involve multiple levels of hearsay (the reports typically are prepared by a dealer based on an interview with a warehouse supervisor or other employee who did not witness the underlying accident). Indeed, the reports routinely prove to contain inaccurate recitations of the underlying facts and circumstances. (Ex. W, Depo. of Michael W. Rogers, 209:5-210:5).

Fourth, Raymond is unaware of any authority, legal or otherwise, that would permit attribution of one manufacturer's accident rates to a different manufacturer. *See, e.g., Brock v. Caterpillar, Inc.*, 94 F.3d 220, 225 (6th Cir. 1996) (court committed prejudicial error in allowing expert's testimony comparing bulldozers that were substantially different).

## CONCLUSION

For the foregoing reasons, this Court should exclude Newell Rubbermaid's expert, Ben Railsback, from giving testimony at trial in this case.

Dated: March 1, 2010.

Respectfully submitted,

/s/ Raymond D. Jamieson
PATRICK W. SCHMIDT, ESQ.
RAYMOND D. JAMIESON, ESQ.
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI  53202-4497
(414) 277-5000
patrick.schmidt@quarles.com
raymond.jamieson@quarles.com

HARRY T. QUICK, ESQ.
MATTHEW L. SNYDER, ESQ.
BRZYTWA QUICK & MCCRYSTAL
1660 W. 2nd St., Suite 900
Cleveland, OH  44113
(216) 664-6900
quick@bqmlaw.com
snyder@bqmlaw.com

Attorneys for Defendants
THE RAYMOND CORPORATION and
ANDERSEN & ASSOCIATES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of March, 2010, a copy of The Raymond Corporation's Brief In Support of Its Motion to Exclude the Testimony of Ben Railsback was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Raymond D. Jamieson
RAYMOND D. JAMIESON
THE RAYMOND CORPORATION and
ANDERSEN & ASSOCIATES, INC.

**CERTIFICATION OF COMPLIANCE**

The undersigned hereby certifies that The Raymond Corporation's Brief in Support of Motion to Exclude Testimony of Ben Railsback complies with the page limitations set forth in the local rules, in that the case is on the Standard Track and the lengthy of the brief does not exceed 20 pages.

/s Raymond D. Jamieson
Raymond D. Jamieson