## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| NEWELL RUBBERMAID, INC., | ) | CASE NO. 5:08CV2632 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| RAYMOND CORPORATION, et al., | ) | **MEMORANDUM OPINION** |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court are the defendant's motion to exclude the testimony of Ben Railsback (Doc. Nos. 66, 67)[1] and motion for summary judgment (Doc. Nos. 64, 65).[2] For the reasons discussed below, both motions are **GRANTED**.

## I.  BACKGROUND[3]

This is a subrogation action, filed on November 6, 2008, in which plaintiff Newell Rubbermaid, Inc. ("Newell Rubbermaid" or "plaintiff") seeks to hold defendant The Raymond Corporation ("Raymond" or "defendant")[4] liable for workers compensation benefits that plaintiff

---

[1] Plaintiff filed a memorandum in opposition (Doc. No. 76) and defendant filed a reply (Doc. No. 82).

[2] Plaintiff filed a memorandum in opposition (Doc. No. 84) and defendant filed a reply (Doc. No. 84).

[3] Although there are two pending motions and both contain virtually identical exhibits, all of the factual citations contained in this Background section are either from the summary judgment motion or the separately filed deposition transcripts.

[4] Another defendant, Andersen & Associates, Inc., was voluntarily dismissed with prejudice on March 19, 2010. (*See* Doc. No. 81.)

paid to its former employee, Jean Hashman, for injuries she sustained as a result of a forklift[5] accident.

On December 23, 2004, while working at a Newell Rubbermaid facility in Ohio, Ms. Hashman was driving a Dockstocker forklift manufactured by Raymond,[6] which plaintiff had purchased secondhand. This particular forklift is a stand-up, counterbalanced, rear-entry model designed for use "dock to stock," including loading and unloading docked tractor-trailers and storing heavy loads in narrow-aisle warehouse environments. The operator compartment of this forklift is open, i.e., it has no door or operator guard.

Before starting her shift driving the Dockstocker on the day of the accident, Ms. Hashman performed the required safety checklist and did not find anything wrong with the forklift. (Hashman Deposition (May 23, 2007) ("Hashman Dep. 1") at 53.)[7] While driving in a "forks trailing" direction at less than one-third of full speed and with no load, standing in the operator compartment, facing in the direction of the forks, with her right foot[8] on the deadman pedal[9] and her hands on the controls, Ms. Hashman attempted to brake by "plugging"[10] the truck,

---

[5] The forklift goes by many names: forklift, towmotor, lift truck, and truck. All of these names are used at various points in this opinion.

[6] A photograph of a Dockstocker is attached to defendant's motion for summary judgment as Exhibit F. (Doc. No. 65-6.)

[7] Hashman Deposition 1 (Doc. No. 73) is very oddly numbered because each page of the deposition transcript is not confined to a single page of the filed document. Therefore, the Court's citations to this document utilize the page numbers in the header of the electronically filed document.

[8] Ms. Hashman first testified that her left foot was on the deadman pedal; however, she later corrected herself to say that her right foot was on the pedal. (Hashman Dep. 2 at 23, 26-27.)

[9] The "deadman" brake pedal works the opposite of the brake on an automobile. When it is depressed, the forklift continues to move; to brake, the driver must remove her foot from the pedal.

[10] "Plugging" is a way of braking by using the multi-function control handle on the forklift. Plugging has been described by one court as follows:

> If an operator is traveling with the forks trailing and wishes to stop, the operator reverses the position of the multi-function control handle. This action changes the direction in which the forklift is traveling, reverses the polarity of the electric motors, and thus slows down the forklift. At the point where the forklift has stopped and before it begins traveling in the opposite direction,

2

but it failed to stop. She testified that she got scared and intentionally stepped off the lift truck, while it continued to move. (Hashman Deposition ["Hashman Dep. 2"] at 19, 20[11]; Hashman Aff. ¶ 5[12].) Her left foot was seriously injured as a result, requiring partial amputation.

In a deposition taken for a case filed by Hashman against Newell Rubbermaid in the Stark County Court of Common Pleas,[13] Hashman testified as follows:

> I was going backwards, and I made a right. And then I was going to pull forward so I could pick up an empty tycorn [sic] to pick up to the machine so they could put product in it. Well when I turned in, the towmotor wouldn't, it wouldn't stop when I plunged [sic] it to go forward or whatever. And it just kept like traveling backwards. So I more or less panicked, because it was headed for a robot on a sheet that was in the back. It -- I panicked, and I thought I got to get off this thing because it was headed for -- there was a fencing, like a cage, that had the robot caged in. And I said I just got to get off this thing. So I stepped down to get off. And that's when the towmotor, it was still going. And it caught my foot, was under it.

(Hashman Dep. 1 at 64-65.) Hashman has consistently maintained that she did not lose her balance, but that she purposefully stepped off the moving forklift truck, to escape it. (Hashman Dep. 2 at 20, 53.)[14] She also agreed that, had she stayed in the operator compartment, she would probably not have been injured. (Hashman Dep. 2 at 56.)[15]

---

the operator can either release the multi-function control handle or place it in "neutral," either of which ensures that the forklift will remain in the stopped position. (Should the operator maintain the control handle in the reverse position, the forklift would begin traveling in the "forks-forward" direction.)

*Berry v. Crown Equipment Corp.*, 108 F.Supp.2d 743, 745 (E.D.Mich. 2000).

[11] The filed copy of this deposition (Doc. No. 71) has four miniature pages to each sheet. The Court's citations to this deposition are to the actual page numbers of the deposition.

[12] The Hashman Affidavit is attached to the motion for summary judgment as Exhibit K. (Doc. No. 65-11.)

[13] *Hashman v. Newell Rubbermaid, Inc., et al.,* Case No. 2006CV04984.

[14] In a Supervisor Incident Investigation Report completed by Todd Livengood on the day of the accident, it was reported: "[. . .] She turned the lift sharply and says she started losing her balance. While trying to catch herself, she pulled pack on the throttle (keeping the lift in motion) and put her foot down (left) onto the ground. Because her right foot was still on the 'dead-man' -- the lift drove up onto her left foot. [. . .]" (Doc. No. 65-13.)

[15] A post-accident inspection of the forklift conducted by Newell Rubbermaid found no malfunction or other problem with the Dockstocker. (McGath Dep. at 37-42, Doc. No. 72.) The post-accident report cited poor judgment, training, congestion and noise exposure as causes of the accident. (Doc. No. 65-13.)

The forklift Hashman was driving had a warning label on the overhead guard directly facing the operator.[16] It stated, *inter alia*, (1) "Never place any part of your body [. . .] outside the truck[;]" and (2) "When stopping, stay inside compartment until truck comes to a complete halt." (Doc. No. 65-7.) Hashman does not recall ever reading this warning decal or the forklift's operator manual; however, she did know that she was supposed to keep all her limbs inside the operator compartment while the truck was moving so as to avoid injury. (Hashman Dep. 2 at 14-16; Hashman Dep. 1 at 58-59.)

## II. MOTION TO EXCLUDE EXPERT TESTIMONY (Doc. No. 66)

Plaintiff has proffered the testimony and expert report of Ben T. Railsback. (*See* Railsback Report ("Report"), Doc. No. 67-22; Railsback Deposition ("Railsback Dep."), Doc. No. 74.) Railsback opines that the forklift involved in this case was defectively designed and unreasonably dangerous because the operator compartment did not have a latching rear door or, at the very least, a spring-loaded rear door to prevent the operator's foot from leaving the operator compartment.[17] He opines that Raymond has long been aware of this hazard but failed to provide an effective operator guard (e.g., a door), a remedy which, in his view, would have been technically and economically feasible. He further opines that the warning label on the forklift is defective, although he admits that a better warning would not have prevented this accident.

Raymond argues that Railsback's testimony and report should be excluded because he "is the quintessential expert for hire, and his opinions in this case are pure litigation

---

[16] A photograph of the warning label is attached as Exhibit G to the motion for summary judgment. (Doc. No. 65-7.)

[17] Raymond argues that plaintiff's theory is that the appropriate alternative design is *only* a latching rear operator guard; however, this is not accurate. Plaintiff's position is that a latching door would be best, but a spring-loaded door would also be a suitable alternative and certainly better than no door at all.

4

constructs." (Doc. No. 67 at 6.) In opposition, Newell Rubbermaid asserts that Railsback "is a highly qualified mechanical engineer and an expert in the field of stand-up lift truck design, operation, and safety." (Doc. No. 76 at 1.)

## A.     Applicable Law

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993), the Supreme Court addressed the standard for admitting expert scientific testimony and assigned a gatekeeping function in this regard to the trial court. *Id*. at 589. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Court extended the gatekeeping function to encompass all expert testimony.

The starting point for the analysis is Fed.R.Evid. 702.[18] Under this rule, an expert's opinion is admissible, at the discretion of the trial court,[19] if the opinion satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.* Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." *Id.*

---

[18] If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[19] In making its determination as to the appropriateness of admitting an expert's testimony under Rule 702, a court need not hold an evidentiary hearing. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir.), *cert. denied*, 534 U.S. 822 (2001), citing *Kumho*, 526 U.S. at 152 ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable.").

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir.2008) (citing *Daubert*, 509 U.S. at 593-94). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30 (citing Rule 702). *See Daubert,* 509 U.S. at 595 ("[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate").

**B.    Analysis of Plaintiff's Expert Under These Standards**

**1.    The Expert's Qualifications**

The Court turns to the first step of the Rule 702 inquiry, namely, whether Railsback is "qualified." The following can be gleaned from his resume. (Doc. No. 76-2.)

Railsback holds a B.S. in Engineering with a Mechanical Specialty and an M.S. in Engineering Systems. He is a registered professional engineer in the State of Colorado, is board certified in forensic engineering by the National Academy of Forensic Engineers, and is an accredited traffic accident reconstructionist. He is a member of six professional societies. His relevant work experience, according to the resume, has been gained primarily at the company for which he currently works, Knott Laboratory, Inc., where he was an engineer from June 2000 to April 2005 and where he is currently a manager in the mechanical engineering section. He has engaged in reconstruction,[20] product development,[21] safety engineering[22] and vehicle

---

[20] His reconstruction work includes performing investigations "of high and low-speed motor vehicle accidents"; "use of energy and momentum analysis to determine the speed of vehicles involved in accidents, crashworthiness of vehicles, restraint systems, occupant compartment intrusion, driver reaction, time/space relationships and analyses, as well as headlamp filament examination." His investigations "involve analysis of vehicle dynamics, occupant kinematics, vehicle safety, human factors and visibility studies."

[21] While at Knott Laboratory, he "has assisted private companies in the development of automotive glazing products, and safety equipment for snow mobiles." "In past employment, he has conducted life-cycle testing, including time-to-failure analyses, vibration analyses, stress and strain tests, pressure testing, leak-down testing, and time & frequency domain analyses." Notably, he has never done any product development in the field of forklifts.

engineering.[23] He has "been asked to provide testimony as an expert witness over a dozen times[,]" although his resume does not identify any specific cases by name. He "has testified for both plaintiffs and defendants and qualified as an expert witness in the areas of mechanical engineering and accident/incident reconstruction." Again, his resume does not specify names of cases where he was qualified as an expert. Finally, Railsback has co-authored two peer-reviewed publications relating to forklifts[24] and several other articles relating to other topics in the field of engineering.

Rule 702 requires that the expert have "specialized knowledge" with regard to the area about which he will testify. "Although this requirement has always been treated liberally, as the Sixth Circuit recently observed in *Pride v. BIC Corporation*, 218 F.3d 566 (6th Cir. 2000), that liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.' " *Berry v. Crown Equipment Corp.,* 108 F.Supp. 2d 743, 749 (E.D. Mich. 2000). "The court is to examine 'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for the witness to answer a specific question.' " *Id.* (quoting *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997)). "Thus the

---

[22] Railsback has been "involved in extensive investigation and analysis in the area of material handling equipment such as stand-up and sit-down forklifts, racking systems, and warehouses." He "has also been involved in liability investigation involving construction equipment[.]" Aspects of these investigations "include maintenance, safety engineering, human factors, and incident reconstruction." He is "fluent in the safety engineering aspects" of various agencies.

[23] Railsback was "a team member of the Colorado School of Mines, Society of Automotive Engineers (SAE) sponsored, small-scale formula-style race car program for several years." In 1997, he was "part of a team that developed an engine test stand." In 1998, he was responsible for "a final belt drive system" and "as a team member constructed the chassis, suspension, and drive train." He was the "suspension design team leader of the 1999 race car" and has worked with aspects of suspension systems. Notably, he has no specific vehicle engineering experience with forklifts.

[24] Railsback, Ben T., Richard M. Ziernicki. "Hazard Analysis and Risk Assessment for the Operators of Stand-Up Forklifts." *2008 ASME International Mechanical Engineering Congress and Exposition, Paper Number IMECE2008-66427* (November 2008); Railsback, Ben. T., Richard M. Ziernicki. "Forensic Engineering Assessment of Safety for Stand-Up Forklifts." *Journal of the National Academy of Forensic Engineers* (June 2008).

trial court must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Id.*; *see also Kumho*, 526 U.S. at 156 ("The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case.").

Railsback's credentials do not relate specifically to forklifts. He admits that he has never designed any component of a forklift nor consulted with a forklift manufacturer with respect to the design of a forklift. Further, although he opines that either a latching rear operator guard or a spring-loaded rear operator guard would have made the Dockstocker forklift safer, he never designed or tested any such alternatives, not even for purposes of his report. Railsback himself has no formal training in the operation of forklifts. He has never operated a stand-up forklift, much less a Dockstocker or any other Raymond forklift. He has never drafted a warning or an operator's manual for a stand-up forklift and he has never communicated with the American Society of Mechanical Engineers (ASME) B56.1 committee that drafts the design and safety standards for stand-up forklifts. All of his opinions regarding forklifts of any kind were formed in connection with litigation, although he would call it not "litigation" but "forensic engineering." (Railsback Dep. at 307-12.)

As gatekeeper, the Court concludes that Railsback, although trained in engineering, does not have specific qualifications to be identified as an expert in the field of forklifts.

2.     **Reliability**

In *Daubert*, the Court held that the trial court

must determine at the outset, pursuant to Rule 104(a), [footnote omitted] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. [footnote omitted] This

8

> entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592-93. "It is Plaintiff's burden to establish by a preponderance of evidence that her expert's theories are reliable and adequately supported by sound technical data, methodology and testing. *Berry*, *supra*, 108 F.Supp.2d at 754 (citing *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997)). In assessing reliability, the court should focus on "the soundness of the expert's methodology." *Smelser*, 105 F.3d at 303.

 *Daubert* offered a non-exclusive list of factors to aid judges in determining whether a particular opinion is grounded in reliable scientific methodology: (1) "whether [the proffered theory] can be (and has been) tested[,]" *Daubert*, 509 U.S. at 593; (2) "whether [it] has been subjected to peer review and publication[,]" *id*.; (3) whether it has been evaluated in light of "the known or potential rate of error," *id.* at 594; and (4) whether it has been accepted in the "relevant scientific community[,]" *id.*

 Even if Railsback *could* be considered qualified as an expert, his report utterly fails to meet the reliability requirement of Rule 702 and *Daubert* and its progeny.

 After reviewing "A. [t]he sequence of events leading up to the collision between the lift truck and the robot cage[,]" Railsback's report draws conclusions regarding five areas of inquiry:

> B. Whether or not the design of the lift truck was unreasonably dangerous.
> C. Whether or not Raymond was aware of the hazard associated with the lift truck that caused Ms. Hashman's injury.
> D. Whether or not the hazard could have been eliminated.
> E. Whether or not the hazard should have been eliminated by Raymond.
> F. Evaluation of warnings on the Raymond forklift truck.

(Report at 2.)

Railsback's entire analysis in Section B of his report is based exclusively on his review of documents and accident reports relating to other forklifts, many of which were manufactured by Crown not Raymond, and reports which had been provided in "past litigation." (Report at 4, ¶ 2.) He draws the majority of his conclusions based on Crown accident data which he never independently verified and from which he simply extrapolates as to the Raymond forklift. Moreover, his analysis of the various accident reports that he had in his possession amounts to no more than counting up how many accidents had occurred. He simply reports raw data and never makes any attempt to evaluate it from a statistical perspective.

For example, on pages 8-9 of his Report regarding whether the product was unreasonably dangerous, Railsback observes that past investigations into Crown forklift accidents between 1977 and 2008 revealed "534 serious lower left leg injuries." (Report at 8, ¶ 10.) Since Crown began producing stand-up lift trucks in 1972, he then assumes that there must have been *more than* 534 injuries because of the additional years for which he had no reports and because "it is likely that not all injury accidents have been reported to Crown[,]" a conclusion that is pure speculation. (*Id*.) He adds another 73 minor lower leg injuries reported between 1977 and 2004 to conclude that 607 lower leg injuries out of 3500 total injuries had occurred. (Report at 8, ¶ 11.) He never reports, for purposes of a proper statistical analysis, how many times in those same time periods forklifts had been driven *without* injury or accident. Therefore, these raw data really have no *statistical* meaning. After listing this unreliable data, he makes the even more unreliable declaration that "[d]ue to the similarity between the Raymond trucks and Crown trucks there is likely a similar statistical rate of injury. Therefore, for every 200 to 250 stand-up Raymond lift trucks, it is likely that an operator will sustain serious lower limb injury." (Report at p. 9, ¶ 14.) Finally, he concludes: "Based on my evaluation of the design and performance

10

record of stand up lift trucks equipped with an open operator compartment, I have concluded that a significant crush or pinch point hazard exists for the operator's lower leg. I have further concluded that the risk (probability of injury) associated with this hazard is unacceptable. Therefore, I have concluded that the Raymond stand-up lift truck is unreasonably dangerous." (*Id.* ¶ 16.)[25]

Railsback's methods are clearly not scientifically sound. He merely counts accidents from accident reports relating to non-Raymond forklifts. Without questioning or verifying the data and without conducting any tests of his own (except irrelevant acceleration tests[26]), he reaches conclusions about the forklift involved in this case.[27] Furthermore, although,

---

[25] Section C of the Report does no more than state the obvious: "that Raymond was aware of the hazard of foot crush associated with stand-up lift trucks at least since the first injury [which] occurred in approximately in 1961." (Report at 10, ¶ 7.) This section is so lacking that it does not even merit further discussion by the Court.

[26] The only testing performed by Railsback related to acceleration and braking which he identified as "a fundamental issue in this case." (Railsback Dep. at 22.) The testing took about 30 minutes (*id.* at 54) and amounted to the operator (not Railsback himself) starting the forklift from a resting position, accelerating to top speed, and then braking with the deadman brake or by plugging (*id.* at 53). Railsback did this to prove whether or not an operator would be subject to losing his or her balance. However, this is entirely irrelevant because Ms. Hashman was firm in her belief that she did not put her foot out of the operator compartment because she lost her balance.

[27] In *Ortiz v. Yale Materials Handling Corp.*, No. CIV. 03-3657FLW, 2005 WL 2044923, at *6-7 (D.N.J. Aug. 24, 2005), the court reasoned, in part, as follows when rejecting a proffered expert:

> In forming his opinion, [the expert] relied heavily on the Crown Accident Reports, which consist of 804 accident reports collected over a 15 year period by Crown, a forklift manufacturer. Tr. 33:1-6, 34:14-21. However, [he] could not confirm that a single one of these reports was completed by a representative of Crown. Instead, each report was completed by someone at the scene of the accident who did not work directly for Crown. Tr. 84:14-85:9. Moreover, [the expert] admitted that he accepted the contents of the documents provided by Mr. Dunlap, a Crown employee, without investigating exactly what happened in any of the accidents or how the severity of injuries was determined. Tr. 85:10-24. Furthermore, [he] made no attempt to correlate Plaintiff's accident to the Crown accidents in order to determine if any of the 804 accidents involved a substantially similar or identical forklift to the Yale forklift model involved in this case. Tr. 99:17-24.
>
> The most troubling aspect with the reliability of the Crown data is that [the expert] did not use any methodology or analysis to reach his conclusion regarding operator safety in forklifts. According to [the expert], Crown did not conduct any statistical analyses or inquiries to assess the validity or reliability of the accident reports. Tr. 46:15-18. Sevart even testified that there is no conclusion to be drawn from these tables of Crown accident reports, but rather, that the reports merely show a statement of fact; namely "[t]hat the operator is better protected by staying in the confines of the forklift than if he tried to jump." Tr. 47:9-19. [. . . ]
>
> "'[A] proffered expert witness ... must possess skill or knowledge greater than the average layman....'" *Elcock*, 233 F.3d at 741 (citing *Waldorf*, 142 F.3d at 625 (citations omitted));

11

in Sections D and E of the Report, he opines that a latching or spring-loaded rear door is necessary to make this forklift safe and that such a modification would be technically and economically feasible, he never actually tested either of these alternative designs.

The case of *Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001) (relied on by *Brown v. Raymond Corp.,* 432 F.3d 640 (6th Cir. 2005), *aff'g* 318 F.Supp.2d 591, 597 (W.D.Tenn. 2004)), is factually very similar to the instant case. Dhillon was operating a stand-up forklift without a rear door on the operator's compartment. He was headed toward a telephone affixed to an I-beam so he could respond to a page. He realized he had gotten too close to the beam and, fearing a collision, tried to stop by shifting gears from reverse to forward, that is, by "plugging." The forklift jerked and his left leg slipped out of the compartment and was pinned between the I-beam and the truck. As in the instant case, Dhillon claimed that the design of the truck was defective because there was no rear door to prevent his leg from slipping out. Dhillon sought to admit the expert testimony of a mechanical engineer and a biomechanical engineer, both of whom would have testified about an allegedly safer alternative design, namely, an operator's compartment with a rear door. They would have opined that the defendant's failure to equip the forklift with this rear door was the proximate cause of Dhillon's injury and that adding a rear door would not have increased the risk to the operator.

The court of appeals in *Dhillon* affirmed the district court's exclusion of both experts, reasoning as follows:

*see also Paoli,* 35 F.3d at 741. [The expert's] simple review of the numbers in the chart, which does not incorporate any kind of statistical or mathematical analysis, offers no substantial support for his opinion that operators are safer staying inside a forklift rather than jumping out during a lateral tip-over, and that a stand-up forklift should come equipped with a rear door and a warning. It is clear from [his] testimony during the hearing that he employed no special skill or technique different from a layperson in forming his opinion and conclusions regarding forklift safety. [The expert] did not use any methodology to account for the difference in the number of operators who jumped from the forklift versus those who remained in the operator compartment during a tip-over.

We could identify a number of problems with the testimony these witnesses were prepared to offer, but the most glaring among them is the lack of testing, or more generally the failure to take any steps that would show professional rigor in the assessment of the alternative designs (or, as the amended rule puts it, that the testimony is "the product of reliable principles and methods"). Although both experts wanted to assert that the truck design was defective because it did not include a rear door, neither expert has actually designed a model of a forklift truck with a rear door. Nor has either performed any tests of such a model to see if it is both economically feasible and just as safe or safer than the model without the door. In alternative design cases, we have consistently recognized the importance of testing the alternative design. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 535-38 (7th Cir. 2000); *Cummins v. Lyle Industries*, 93 F.3d 362, 368 (7th Cir. 1996). In deciding whether an alternative design is appropriate, an expert needs to look at a number of considerations: "the degree to which the alternative design is compatible with existing systems ...; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative designs; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine." *Cummins*, 93 F.3d at 369. Many of these considerations are product- and manufacturer-specific and cannot be reliably determined without testing. *Id.* This case illustrates why these questions are crucial. In some environments, the record suggests that the presence of a rear door could exacerbate injuries to the operator by slowing an escape from a forklift tipping over or falling off of a dock.

*Dhillon*, 269 F.3d at 869-70.[28]

In this case, as already noted, Railsback took no "steps that would show professional rigor in the assessment" of the original design. His assessment of his proposed alternative designs is equally lacking in professional rigor.

In support of his purportedly safer alternative designs, he makes some virtually unfounded declarations: (1) that "[o]ther forklift designs are available that would likely

---

[28] The facts in the instant case relating to the deficiency of the expert's testimony and his opinion regarding the desirability for either a spring-loaded or latching rear door are even more compelling than in *Dhillon*. In *Dhillon*, the operator's foot accidentally slipped out of the operator compartment. Here, Hashman *purposely* moved her foot out of the lift truck. Therefore, even setting aside the defendant's argument that the suggested alternative designs might be more dangerous because they would impede an operator who needs to leave the operator compartment for safety reasons (e.g., in the case of a tip over), a spring-loaded or latching rear door would not have made a difference in this case because the operator *wanted* to exit the compartment and would undoubtedly have simply pushed any such door open.

13

significantly reduce the hazard" (Report at 11, ¶ 2); (2) that Raymond itself has made available through its parts catalog a full length rear guard, but that neither the part nor the advertising brochure for the part was available on the Raymond website (*id*. ¶ 3); (3) that, prior to Ms. Hashman's accident, both Raymond and other manufacturers had developed "feasible design alternatives" (*id*. ¶ 5); and (4) that "Raymond has designed, manufactured, and sold stand up lift trucks equipped with a hinged operator compartment door [and] Raymond has likely produced doors both for the truck involved in Ms. Hashman's accident, and earlier models of similar stand up lift trucks" (*id*. at 12, ¶ 8).

Railsback then cites to "the deposition testimony of Robert E. Jones in *Toporek v. Clark* (deposition dated 10/28/83) regarding an injury that occurred on a Clark stand-up lift truck[ ]" for the opinion that "a full length door on the operator compartment would have prevented the Toporek injury." (Report at 11, ¶ 6.) Similarly, he cites "Dr. Edward Caulfield's deposition testimony in a case named *Roush v. Raymond* (deposition dated 10/6/86)" for the opinion that "a latching door was [a] technically and economically feasible option at the time that the stand up lift truck involved in the Roush case was designed." (*Id*. at 12, ¶ 7.)[29] He makes no effort to elucidate the facts of these two cases much less compare them to the facts underlying the instant complaint so that some assessment of true similarity could be made.

Railsback also outlines some conclusions he reached "[i]n past engineering investigations" regarding the safety and feasibility of rear doors that had been added to Crown-manufactured lift trucks used by Ford Motor Company and K-Mart. Because the door added only $544 to the price, he "concluded that consumers were willing to absorb this cost." (Report at 15, ¶ 14.) He listed several competitors of Raymond and Crown who offer doors as options on their

---

[29] No identifying case citation is provided for either the *Toporek* or the *Roush* case.

lift trucks (*id.,* ¶ 16) and several buyers of lift trucks who have either "inquired about the purchase of doors" or have "purchased doors from Crown" (*id.*, ¶ 15.) He quotes a March 1995 conversation between a Crown executive and a Ford Motor Company executive for the proposition that Ford "is feeling doors are the way to go and that they should also have latches." (*Id.*, ¶ 17.) Without reference to anything other than the fact that the Crown executive "cannot recall any lower left leg injuries on lift trucks equipped with doors" (*id.*, ¶ 18), he credits that executive with stating "that trucks equipped with doors are equally safe to trucks without doors." (*Id.* at 16, ¶ 20.) In several additional paragraphs, he outlines even more anecdotal "evidence" that forklifts with rear doors on the operator compartment are safe and feasible alternatives. (*Id.*, ¶¶ 21-24.)[30] Railsback never attempts to compare the usages of the Ford and/or K-Mart modified lift trucks to Newell Rubbermaid's usage of the Raymond lift truck. It is impossible to tell whether the Ford and/or K-Mart experiences have any relevance to the instant case. Therefore, the reliability of any of this anecdotal information is highly suspect.

Thereafter, Railsback begins an analysis of the effect of acceleration on the operator's balance, citing Gerald Harris and John DeRosia of the University of Marquette, who "have examined the dynamic postural stability of standup lift truck operators and found that the

---

[30] In a lengthy paragraph, Railsback reports the testimony of Nancy Malone in *Elam v. Raymond* (no case number or other citation supplied) with respect to her experience with Caterpillar lift trucks when she was Fleet Delivery Manager for Home Base, a building materials retailer. In another paragraph, he reports the testimony of Muriel McSweeney in *Porter v. Crown* (again no citation), alleged to be a "foot crush accident" at Wal-Mart, who purportedly "had developed the opinion that it was a 'natural response' of employees to stick a foot out of the operator compartment in an attempt to fend off a collision with a fixed object." All of this is hearsay, since there is no opportunity to cross-examine information which is intended to be simply taken as true and as proof that lift trucks with rear operator guards are safer than those without. Even so, Railsback concludes: "Consistent with Muriel McSweeney at Wal-Mart, and Nancy Malone at Home Base, Jeremy Zahn, the Corporate Director of Safety and Health for Newell Rubbermaid, has apparently been tasked with reducing or eliminating lower limb injuries among stand-up forklift operators[ ]" [and] "[a]fter consideration of the issue, Newell Rubbermaid has decided to equip all of their [sic] stand-up forklifts with doors[ ]" which "reportedly cost approximately $300 to $400." (Report at 17, ¶ 23.) There is absolutely nothing in the report to link the experiences of Malone and/or McSweeney to that of Zahn; there is nothing to suggest that Zahn even knew of Malone and/or McSweeney. This is but another of many examples of the lack of "professional rigor" in Railsback's analysis.

levels of acceleration in forklift operation are similar to values previously identified as causing loss of balance." (Report at 17, ¶ 25.) He declares: "Had Ms. Hashman applied the deadman brake while turning sharply, as [unspecified] deposition testimony indicates, the forklift would have produced accelerations exceeding the threshold which can reportedly cause loss of balance." (*Id*. at 18, ¶ 27.) He makes this remark notwithstanding the fact that Ms. Hashman has reaffirmed a couple times that she did not lose her balance but, instead, purposefully stepped out of the lift truck.

Railsback also notes that Knott Laboratory (his employer) "published a peer reviewed paper with the American Society of Engineers in 2008 that shows that the most common accident involving stand-up forklifts is a collision accident." (Report at 19, ¶ 32.) Why this is relevant in the instant case which involves a foot-crush injury, not a collision, is a mystery.

Railsback criticizes Raymond for its position that "a door should not be added to stand-up forklifts due to the increase in egress time from stand-up forklifts when a door is added." (Report at 18, ¶ 28.) Operators are advised to jump out during tip-over or fall-off-the-dock accidents and a door increases the time it takes to do that. He opines that "prevention of dock accidents is a better solution to injury reduction than forbidding the use of a safety door." (*Id*. at 19, ¶ 34.) He never gives any statistics to support his "better solution" nor did he himself conduct any tests to prove this point.

Section E of Railsback's report, addressing whether the "hazard" he has identified should have been eliminated by Raymond, is no more scientifically rigorous than any of the previous sections. He reviews Raymond's own policy books, which state that hazards should be eliminated or at least guarded against or warned against. (Report at 20-21, ¶¶ 4, 5.) Because Raymond "has been aware of the hazard of foot crush for at least 45 years," Railsback concludes

16

that "Raymond should have modified the design of the [forklift] to eliminate the hazard" and because it did not do so, "the Raymond lift truck is unreasonably dangerous and defective due to the hazard associated with the pinch point or crush point to the lower left extremity of the operator." (*Id*. at 21-22, ¶¶ 9, 10.) He further concludes that "a latching door" is "the most effective solution" and a "spring loaded door" would also be "an effective solution." (*Id*. at 22, ¶ 11.)

As in *Dhillon*, Railsback's report fails to "satisf[y] the other *Daubert* guideposts used to examine reliability of the methodology." *Dhillon*, 269 F.3d at 870. The court in *Dhillon* noted:

> Neither [expert] has provided any evidence that the rear door proposal has been favorably subject to peer review or generally accepted in the relevant communities. The plaintiff could not point to even one forklift manufacturer that has installed rear doors for general application or even one regulatory body or standards organization that requires or recommends a rear door on forklift stand-up trucks. To the contrary, the record shows that [one of the experts] has twice tried to persuade the professionals on the American National Standards Institute committee to require a rear door; the committee has twice rejected the idea.

*Id*.

The final section of Railsback's report[31] deals with the warnings on the forklift. Therein, he draws conclusions based on "a review of the warning label[.]" (Report at 22, ¶ 1.) He describes the label as failing to "indicate the severity of the consequences" (*id*., ¶ 3); as containing "no symbols or graphics" (*id.*, ¶ 4); and as "not instruct[ing] the operator what to do in the event of a tip over or off the dock accident" (*id.* at 23, ¶ 5). Why any of these warnings are important or even relevant in this case is not made clear. On the basis of his visual description of the warning label on the lift truck (which any trier of fact could do without the help of an expert),

---

[31] This is identified as Section "G;" however, it is really Section "F."

he concludes "that the warning is defective[.]" (*Id.*, ¶ 6.) He also concludes that the warning is "lagging behind the industry" because it "does not represent state of the art[ ]" and "does not comply with ANSI recommendations to include pictorial symbols." (*Id.*). However, he does not elaborate on what "state of the art" would be or on how or whether "pictorial symbols" would have prevented this accident.

This lengthy description of Railsback's report shows that it simply does not meet the *Daubert* standard requiring "reasoning or methodology" that is "scientifically valid."

**3.      Relevance**

In addition to the element of reliability, the Court must also examine relevance. "Relevance" relates to the "fit" of the testimony, that is, "whether the reasoning or methodology properly can be applied to the facts in issue[,]" *Daubert*, 509 U.S. at 593, so as to assist the trier of fact.

Here, Railsback's report and testimony would not assist the trier of fact to understand issues relating to forklifts, which have been described as "complex products not familiar to ordinary consumers." *Brown*, *supra*, 432 F.3d at 644, 647.

In the first place, there was no scientific methodology to speak of; in fact, much of what Railsback did could be just as easily done by a jury (e.g., counting accidents from accident reports). Secondly, what little "methodology" there might have been (and the Court uses that term very loosely) had to do with forklifts that were not manufactured by Raymond and were not shown scientifically to be reasonably similar to the Raymond forklift involved herein. Third, conclusions were drawn in the Report from circumstances that bore no relationship to the facts of this case (e.g., drawing conclusions about this foot crush case based on information from operator stability/balance cases or collision cases) and from other uses of forklifts that were not

18

shown to be similar to Newell Rubbermaid's uses (e.g., drawing conclusions about rear operator guards as a safety feature based on Crown forklifts which had been modified for use by Ford and K-Mart).

The Court concludes that plaintiff's expert report does not meet the requirement of relevance.

## C.    Conclusion Regarding Plaintiff's Expert

Having carefully examined the plaintiff's expert report in light of Rule 702 and *Daubert*, the Court concludes that the expert, Ben T. Railsback, does not have "specialized knowledge [that] will assist the trier of fact" in this case involving a forklift and, further, that the testimony that would be offered by Railsback is not the "product of reliable principles and methods [. . .] applied [. . .] reliably to the facts of the case." Rule 702.

Accordingly, defendant's motion to exclude the testimony of plaintiff's expert (Doc. No. 66) is **GRANTED**.

## III. MOTION FOR SUMMARY JUDGMENT (Doc. No. 64)

## A.    Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Rule 56(e)(2). Affidavits filed in support of or in opposition to

a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Rule 56(e)(1).

**B.      Analysis**

**1.      Design Defect/Product Liability Claim**

Plaintiff alleges in Count One of the complaint that Raymond's Dockstocker forklift is "defective by reason of a design defect" (Compl. ¶ 18) within the meaning of Ohio Revised Code § 2307.71, *et seq.* A similar allegation is made in Count Two under a negligence standard. (Compl. ¶ 21.) The injury in this case occurred on December 23, 2004. In order to recover on its subrogation claim, Newell Rubbermaid, who stands in the shoes of Ms. Hashman, must establish a design defect products liability claim under Ohio Revised Code § 2307.75(A) which, at that time,[32] provided in relevant part:

(A)      [. . .] [A] product is defective in design or formulation if either of the following applies:

(1)      When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation [. . .] exceeded the benefits associated with that design or formulation [. . .];

(2)      It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

[. . .]

(F)      A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or

---

[32] This statute was amended, effective April 7, 2005 to eliminate the consumer expectation test; however, because of the date of the accident, the amended statute does not apply herein. *See, e.g., Moeller v. Auglaize Erie Machine Co.*, No. 2-08-10, 2009 WL 161784, at *6 (Ohio App. 3 Jan. 26, 2009) (applying prior version of the statute to an industrial mower accident that had occurred prior to the April 7, 2005).

intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce.

Therefore, the two fundamental elements that a plaintiff must prove in order to prevail are: (1) that there was a defect,[33] and (2) that there was a practical and technically feasible alternative design.

Raymond argues that plaintiff has failed to prove there is a practical and technically feasible alternative design and, therefore, it cannot prevail on the underlying products liability claim. The fundamental issue in this case is whether the open back design of the Dockstocker forklift is a defective design which should have been corrected by either a latching or a spring-loaded rear operator door.[34] Newell Rubbermaid argues in the affirmative and would present the testimony of its expert, Ben Railsback, to support that position.[35]

The Court, however, has determined that the testimony and report of plaintiff's expert does not meet the requirements of Rule 702 and *Daubert*. Therefore, the first question for the Court to address is whether, as defendant asserts, expert testimony is required to prove the

---

[33] "In determining whether a product design is in a defective condition, a single, two-pronged test should be used: under the consumer expectation standard prong, a defendant will be subject to liability if the plaintiff proves that the product design is in a defective condition because the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; under the risk-benefit standard prong, a defendant will be subject to liability if the plaintiff proves, by using relevant criteria, that the product design is in a defective condition because the benefits of the challenged design do not outweigh the risks inherent in such design." *Cremeans v. Internat'l Harvester Co.*, 6 Ohio St.3d 232 (1983), superseded by statute as stated in *Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St.3d 507 (1998).

[34] *See*, note 17, *supra.*

[35] The American Society for Mechanical Engineers ("ASME") promulgates safety standards for lift trucks which are accredited by the American National Standards Institute ("ANSI"). The ASME/ANSI B56.1 standard 7.28 addresses "Operator Protection for Stand Up, End Controlled, Narrow Aisle and Counterbalanced Trucks." Section 7.28.1 provides that "[g]uards or other means *may* be provided as part of the truck *to limit intrusions* into the operator's area of horizontal members (e.g., rack beams), oriented generally transverse to the direction of travel." (Doc. No. 65-5 at 6, emphases added.) Section 7.28.3 provides that "[o]perator protection means *shall* be designed so as not to interfere with the normal operation of the controls, *to allow getting on and off the truck easily, and to permit rapid exit in an emergency.*" (*Id.* at 7, emphases added.)

underlying products liability claim and, absent such expert testimony, defendant would be entitled to summary judgment.

> Although it is often necessary for a plaintiff asserting a design defect claim to present expert testimony in support of that claim, expert testimony is not always required to prove the material elements of a design defect claim. *See Atkins v. GMC* (1999), 132 Ohio App.3d 556, 564, 725 N.E.2d 727; *Colbach v. Universal Tire Co., Inc.* (1996), 108 Ohio App.3d 448, 504, 670 N.E.2d 1366; *Grover Hill Grain Co. v. Baughman-Oster, Inc.* (C.A.6, 1984), 728 F.2d 784, 794. Where the claim involves a simple device without any complex features or designs, circumstantial evidence may be sufficient to establish that a defect existed. *Atkins, supra*.

*Winkles v. Pontiac*, No. L-03-1034, 2004 WL 485565, at * 3 (Ohio App. 6 Mar. 12, 2004); *see also*, *Bowins v. Euclid General Hosp. Ass'n*, 20 Ohio App.3d 29, 31 (Ohio App. 8 1984) ("[e]xpert testimony is not required unless the subject of inquiry is outside the common, ordinary and general experience of lay persons").

In *Brown v. The Raymond Corp.*, 432 F.3d 640 (6th Cir. 2005), *aff'g* 318 F.Supp.2d 591(W.D. Tenn. 2004),[36] the court agreed with the district court's assessment "that a forklift is a complex machine beyond the purview of the ordinary consumer and that Brown was therefore obligated to provide expert testimony in order to survive a motion for summary judgment." *Id*. at 646. The court was construing the Tennessee products liability statute defining "unreasonably dangerous" for purposes of determining whether a product (a forklift) was defective in design. Under Tennessee law, the definition of "unreasonably dangerous" contemplates both a "consumer expectation test" and a "prudent manufacturer test." *Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 530-31 (Tenn. 1996). Because the district court concluded that the ordinary consumer has little or no knowledge of forklifts and, therefore, no

---

[36] The facts in *Brown* are not identical to those in the instant case, but they are reasonably similar. In *Brown*, the plaintiff's left foot was crushed when, during the collision of two forklifts, the open back operator compartment of Brown's forklift was entered by the bumper and wheel well of his co-worker's forklift. At least one of Brown's excluded experts had the opinion that the open operator compartment contributed to the injury.

"expectation" regarding how one should work or whether it was safe as designed, the prudent manufacturer test had to be applied and that test, under Tennessee law, required expert testimony. Since the court in *Brown* had excluded the testimony of plaintiff's two experts, summary judgment was granted in favor of the defendant. This decision was affirmed on appeal. Because Tennessee's prudent manufacturer test "includes a risk-utility balancing approach[,]" *id.* at 533, the conclusions of the court of appeals regarding the complexity of a forklift and the necessity of expert testimony under the prudent manufacturer test are equally applicable when applying the Ohio statute's risk-benefit test.

In its opposition to defendant's motion for summary judgment, plaintiff asserts that Raymond's motion only addressed the risk-benefit test in Ohio's product liability statute and failed to address the consumer expectation test. However, under the teachings of *Brown*, because a forklift has been determined by the Sixth Circuit to be a complex mechanism, the consumer expectation test is inapplicable and, when applying the risk-benefit test, expert testimony is required. Since the Court has already excluded plaintiff's expert's testimony, plaintiff is unable to meet its burden of proof on the products liability claims and defendant is, therefore, entitled to summary judgment to the extent plaintiff seeks subrogation for damages for those claims contained in Counts One and Two.

### 2. Failure to Warn Claim

Plaintiff also claims, in Count One, that Raymond's Dockstocker is "defective by reason of inadequate warning or instruction" (Compl. ¶ 18), and, in Count Two, that Raymond was negligent "in providing instructions and/or providing warnings as to the use and operation" of the Dockstocker (Compl. ¶ 21). Raymond argues that these claims must fail for lack of evidentiary support.

23

The operator manual for the Dockstocker forklift tells operators to "never place any part of your body between the mast uprights or outside the truck[.]" (Operator Manual, Doc. No. 65-21.) The warning label on the forklift states, in part: "When stopping, stay inside compartment until truck comes to a complete halt." (Warning Label; Doc. No. 65-7.) Ms. Hashman testified that she did not remember having read the label, but she knew that she could be injured if she placed any body part outside the forklift when it was moving. (Hashman Dep. 1 at 58.) In fact, during her training to drive a forklift, she had been taught never to exit the truck until it was completely stopped (Zahn Dep. at 146) and never to put her hands or feet outside the truck while it was moving so as to avoid injury (Hashman Dep. 1 at 33). Even so, on the day of her accident, when she perceived that she might run into the robot cage because the forklift was not stopping, she voluntarily stepped out of the moving truck with her left foot. (*Id.* at 64-65.)[37]

There is no evidentiary support that there was anything wrong with the warnings in the operator manual or on the warning label. Further, there is no proof that any inadequacy in the warning was the proximate cause of Hashman's injury, especially since she has no actual recollection of ever having read the warning. *See Phan v. Presrite Corp.*, 100 Ohio App.3d 195, 201 (Ohio App. 8 1994) ("[e]ven if the additional warnings suggested by plaintiff's expert [. . .] were given, they would not have prevented the injuries because [plaintiff never] read the warning").[38]

---

[37] Ms. Hashman also testified that she had been driving the Dockstocker for only two months before her accident and she felt "uncomfortable" because she did not think she had received sufficient training from her employer on how to operate the lift truck. (Hashman Dep. 2 at 50, 53-54.)

[38] Even if plaintiff's expert in this case *were* allowed to testify, he would have testified as follows:

  Q.  And let's make it even more subtle. You do not hold an opinion to a reasonable degree of engineering certainty in your field of expertise that a *different warning would have prevented the accident and injury in this case, true?*
  A.  *True.*

24

Accordingly, plaintiff is unable to meet its burden of proof on the failure to warn claims contained in Counts One and Two and, therefore, defendant is entitled to summary judgment on those claims.

### 3.  Breach of Implied Warranty Claim

In Count Three, plaintiff alleges that defendant "breached the implied warranties in that the Lift Truck was not safe for its ordinary and intended use in general warehouse operations without undue danger to the operator of the Lift Truck." (Compl. ¶ 25.)

Raymond argues that this claim must be dismissed because of lack of privity between it and Newell Rubbermaid. However, under Ohio law, even absent privity, one can maintain an action in tort against a manufacturer for injuries caused by a defective product based on a breach of an implied warranty. *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227 (1966). "Recovery is allowed when a defect in the product is the direct and proximate cause of injuries to a person or to property, where these injuries could be reasonably anticipated." *Vetovitz Bros., Inc. v. Kenny Const. Co.*, 60 Ohio App.2d 331, 332-33 (Ohio App. 9 1978) (citing *Lonzrick, supra*, and *Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88 (1975)).

Although privity is not required, this claim must fail because plaintiff has not met its burden of proof with respect to the existence of a defect, much less that such defect was the cause of Ms. Hashman's injuries.

Accordingly, defendant is entitled to summary judgment on Count Three.

---

Q.    And you're not anticipating rendering an opinion on cause at trial regarding a warning, true?

A.    True.

(Railsback Dep. at 247-48). Although, in his report, he actually draws the conclusion that "the warning is defective," (Report at 23, ¶ 6), he never concludes that this allegedly defective warning caused the injury or that a better warning would have prevented the injury.

In its opposition brief, Newell Rubbermaid does no more than cite to "the frequency and severity of injuries caused by [the] open-back design," (Doc. No. 84 at 17), but makes no connection between that and the *causation* element. There is no evidence that any of these injuries were *caused* by an inadequate warning.

**C.      Conclusion**

        Defendant is entitled to summary judgment on Counts One, Two and Three of the complaint and the same shall be entered.[39]


## IV. SUMMARY CONCLUSION

        For the reasons discussed herein, defendant's motion to exclude the testimony of plaintiff's expert (Doc. No. 66) is **GRANTED**. Further, also for the reasons discussed herein, defendant's motion for summary judgment (Doc. No. 64) is **GRANTED**.


        **IT IS SO ORDERED**.


Dated: July 1, 2010                                         _____
                                          **HONORABLE SARA LIOI**
                                          **UNITED STATES DISTRICT JUDGE**

---

[39] The claim for breach of warranty contained in Count Four was only against the dismissed defendant; that claim was, therefore, effectively dismissed when Anderson & Associates was dismissed. Count Five contains the subrogation claim which is moot because summary judgment is granted in defendant's favor on all substantive claims.